UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DENNIS M. DAYE,
RICHARD M. COSTA
MICHAEL DENICOLIS
    Petitioners

v.                                                           CA #

KATHLEEN M. DENNEHY
    Respondent

PETITIONER'S MEMORANDUM IN SUPPORT OF THEIR
PETITION UNDER 28 U.S.C. SEC. 2254 FOR A WRIT OF HABEAS CORPUS

Introduction

    Fourteen years after his conviction and subsequent sentence to life without the possibility of parole, the petitioners' discovered that agents of the Commonwealth withheld exculpatory evidence including:

1. A $10,000.00 payment, after trial, to the sole identification witness, Karen Moodie;

2. Seven Thousand additional documents relating to the first seventeen months of the Paglia murder investigation, before Daye were implicated by Moodie;

3. Original fingerprint cards of two named other suspects who previously could not be located by the Commonwealth for comparison with the prints found at the scene.

4. Boston Police ballistic and documentary evidence of Pasquale "Patsy" Barone's attempted arrest with a weapon similar to the murder weapon

1

used in the Paglia homicide found in the Essex County Prosecutor's file.

The withheld evidence undermined the state court's decision on petitioners' original claims pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and warrants, at a minimum, an evidentiary hearing to further develop facts in support of their claim of actual innocence.

Procedural History

On July 25, 1987 two separate juries (Ronan, J.) convicted the petitioners of two counts of first-degree murder and armed robbery, and armed assault in a dwelling. While their direct appeal was pending in state court, the petitioners came into possession of two police reports that implicated others in the murders of the Paglias.[1] The State Supreme Judicial Court remanded the petitioners' case to Superior Court to allow them leave to file a Motion For a New Trial. The petitioners filed a Motion For a New Trial claiming in pertinent part, Brady violations for the Commonwealth's failure to disclose these two reports inculpating other suspects in the Paglia homicides. Brady v. Maryland, 373 U.S. 83 (1963). On October 16, 1987, Ronan, J., denied the petitioners Motion For a New Trial without an evidentiary hearing. (Exhibit 2). The petitioners consolidated their appeal from the denial of the Motion for a New Trial with his direct appeal. On January 29, 1992, this Court affirmed his convictions. Commonwealth v. Daye, 411 Mass. 719 (1992). (Exhibit 74).

---

[1] The first report was the "Macchia Report", authored by Lynnfield Police Officer Vincent Macchia. In the report, Macchia claimed that he spoke to Elizabeth DiNunzio, the sister of Vincent Limoli, relative to Limoli's recent murder. According to Macchia, DiNunzio claimed "people high up in the underworld" told her that Costa killed Limoli and the Paglias. Daye's claimed Lynnfield Police connection to and interview of DiNunzio would have put them on notice of Lynnfield Police cooperation with Boston Police and led to the discovery of the Murphy-Pitito Report, which implicated Limoli, Barone, and Salemme in the Paglia homicide. The second report was the "Zuc Report" which implicated another person in the murder of Robert Paglia.

2

The petitioners filed a petition for habeas corpus relief in federal court. On April 7, 1993, the federal court, Woodlock, J. remanded the case to state court to allow the petitioners an opportunity to exhaust his federal claims. (Memorandum and Order 4-2-93, Woodlock, J., Exhibit 3).

On January 28, 1994, the petitioners filed their second Motion for a New Trial and request for an evidentiary hearing. On October 12, 1994, the Superior Court, Donovan, J., denied the petitioners' motion without an evidentiary hearing. (Exhibit 4).

The petitioners re-filed their petition for habeas review and request for an evidentiary hearing in Federal Court, Woodlock, J. On September 23, 1997, the court dismissed their petition without an evidentiary hearing. (Memorandum and Order 9-23-97, Woodlock, J., Exhibit 5). Specifically, Judge Woodlock "declined to permit the federal habeas corpus forum to be used for further development of this state case." (Exhibit 5).

On September 14, 1999, the First Circuit affirmed the district court's dismissal of Daye's petition. (Judgment 9-14-99, Silvia, Bowdin, &Lynch). On April 17, 2000, the United States Supreme Court denied their petition for a writ of certiorari. Daye v. Maloney, 120 S.Ct. 1830 (2000).

After the denial of certiorari, petitioners hired a private investigator and secured documents pursuant to the Freedom of Information Act.[2] In April of 2001, petitioners filed a Motion to Obtain Copies of Unidentified Fingerprints found at the crime scene. Petitioners made this request because he discovered that, contrary to the Commonwealth's representations at trial, original fingerprint records for Armando Forlizzi were in the possession of the Massachusetts State Police. (Motion to Compel

---

[2] Prior requests were denied as premature because the case was still pending.

Production of Fingerprint Records, Exhibits 64 & 65). In October 2001, Petitioners filed an additional Motion to Compel Copies of a Supplemental CPAC "Other Suspects" file in the possession of the Essex County District Attorney's Office. Petitioners maintained that this file related to "other suspects" and information surrounding the Paglia homicides prior to focus on Daye, Costa and DeNictolis as suspects. (Supplemental Motion for Production of Documents, Exhibit 66).

Petitioners filed a Third Motion For a New Trial and request for discovery based on the Commonwealth's Freedom of Information disclosures. The Commonwealth filed a Memorandum in Opposition to petitioners' Third Motion for a New Trial. The Court heard argument on petitioners' motion on April 3, 2002 (Rouse, J.). Following this argument, the Commonwealth submitted a letter to the Court explaining several misstatements at argument. Petitioners responded with their letter. (Exhibit 72). On September 26, 2002, the Superior Court denied the petitioners' Motion for a New Trial and Request for Discovery and an Evidentiary Hearing. (Memorandum of Decision and Order, 11-26-02, Rouse, J., Exhibit 73). The petitioners sought permission to appeal the denial of their third Motion for a New Trial. In September 2003, the Supreme Judical Court denied petitioners request for leave to appeal. The petitioners now seek relief pursuant to 28 U.S.C. sec 2254.

Factual Development of the Record Since the Convictions Were Affirmed

A. The $ 10,000.00 payment to Moodie

There is no dispute that Moodie was the Commonwealth's sole witness implicating the petitioners. In fact, this Court found that absent Moodie's testimony "no evidence exist[ed] connecting the petitioners to this crime." Commonwealth v. Daye

4

411 Mass. 719, 722-25 (1992). Knowing that Moodie's testimony was critical to the Commonwealth's case, prior to trial, the petitioners filed a Motion for Promises Rewards and Inducements seeking all information relative to Moodie. The trial court allowed this motion. Specifically, the trial Court ordered the Commonwealth to disclose "any evidence that either may be within its possession, or which may be available to it, that 1) any other person may have committed the offenses that are the subject of these indictments; and 2) any other person had a motive, opportunity and ability to commit the offenses that are the subject of these indictments." Daye at 727. The state trial judge ordered the Commonwealth to disclose, including matters not presently known but hereinafter, acquired all evidence which the prosecution knows, or in the exercise of due diligence ought to know 1) which is favorable to the petitioners and which is material to either guilty or innocence, punishment or calls into question a material element of the prosecution's version; 2) challenges the credibility of a Commonwealth witness; or [corroborates]defendant's denial of guilt." Daye, at 727-728. The Commonwealth failed to disclose its $10,000.00 payment to Moodie. Moodie filed an affidavit and participated in a videotaped statement, under oath, admitting that she believed the Commonwealth's payment to her was in exchange for her assistance in the conviction of the petitioners. (Exhibit 51). The Commonwealth does not dispute that a payment was made to Moodie, rather, it disputes the amount of the payment. (Comm. Opp. To Defs Motion for a New Trial & Letter, Exhibit 70, 71). Although the Commonwealth filed no affidavit in support of its position, it claimed in a letter after argument on the petitioners' Motion For a New Trial that the "collective memory" of the district attorney's office was that the payment to Moodie was for $5,000.00 not $10,000.00. (Exhibit 71). In addition, the

Commonwealth does not dispute that it never informed the petitioners of this payment, rather, the Commonwealth maintains that it had no obligation to inform the petitioners of the payment to it's star witness. (Exhibit 71).

B. The non-disclosed 7000 pages of documents from the first seventeen months of investigation

The petitioners filed a request with both the Lynnfield Police Department and the Essex County District Attorney's Office, pursuant to the Freedom of Information Act, seeking all documents relating to the first seventeen months of the Paglia homicide investigation. Three separate FIO requests generated three separate responses by the Commonwealth, each claiming something different. (Exhibit 39).

1. The Discrepancy Over Who Had Possession of the Macchia Report

The Lynnfield Police Department responded to the FIO request for the first seventeen months of investigation by claiming that it had no records of the Paglia murder investigation. On March 29, 2001, Dianne Williams from the Lynnfield Police Department informed Secretary of State staff attorney, Lauren Inker, that the Lynnfield Police Department "transferred all records in relation to (the Paglia homicide) to the Essex County District Attorney's Office while assisting the office in investigation of the incident. (Exhibit 50, C) According to the Secretary of State's Office, Supervisor of Public Records, Frances Gould, the Lynnfield Police Department violated established regulations by failing to keep any copies of their reports and notes of the Paglia murder investigation. (Exhibit 50, C). Frances Gould informed Lynnfield Police that this failure to keep original records violates G.L. Ch. 66 sec. 8 and 10. (Exhibit 50, C). If the Lynnfield Police Department turned over all reports of the Paglia investigation to the

6

Essex County District Attorney's Office, both the Macchia report and the Murphy-Pitito Report should have been among these documents.

    2. <u>The Discrepancy over Essex County's Contact with the Boston Police</u>

Essex County District Attorney's Office responded to the petitioner's request for documents relating to the first seventeen months of the Paglia Murder investigation by producing 45 documents. Of these 45 documents, nine were Boston Police records relative to a Boston organized crime figure by the name of Pasquale Barone. (December 14, 2000 letter to Daniel Smulow, Exhibit 39,D). These nine reports document the attempted arrest of Barone and the arrest of Barone's wife, Kimberly Barone, at Logan Airport shortly after the Paglia homicide. (Exhibits 42-43). Police seized two firearms in Barone's luggage. One gun was a .357 revolver. (Exhibits 40-48). This gun was test fired and was capable of firing .38-caliber ammunition. The tested projectiles each had five lands, five grooves and a right-hand twist. (Exhibit 43). Patricia Paglia was killed with a gun capable of firing .38-caliber ammunition with five lands, five groves and a right hand twist. (Exhibit 36, Tr. July 9, 101-103 & 108-114; 7-10: 52-59, 113-115, July 15 133-146).

During the petitioners' direct appeal and in all post-conviction proceedings, the Essex County District Attorney's Office represented to the state court that it did not possess any information or records from Boston Police relative to the Paglia homicide. (Exhibit 25 Affidavit of Lt. Spartichino, Trooper Lunch (Exhibit 22), and Officer Vincent Macchia (Exhibit 23)). Essex County District Attorney's Office maintained this position because they claimed there was no joint investigation or cooperation between Essex County CPAC Unit and Boston Police. New Boston Police documents contained in the

7

Essex County District Attorney's file about Barone's arrest, contradict Essex County and Boston Police's representation to the state Court that there was no cooperation between the counties. These Barone documents, at a minimum, "create the appearance of a misstatement" by the Essex County as to the contents of their own Paglia file. Moreover, the state court relied on the Commonwealth's misrepresentation in its opinion when it held that the petitioners could not prove any joint investigation. Daye at 729.

### 3. The Seven Thousand Pages of Documents

The Essex County District Attorney's Office responded to another FIO request admitting that it possessed approximately 7000 pages of documents relating to the first seventeen months of the Paglia homicide investigation. Essex County District Attorney's Office requested that the petitioners and specifically, petitioner Daye pay $10,000 for the coping and redacting of these documents. (Exhibit 50). For the past fourteen years, Essex County District Attorney's Office had maintained it had no discoverable documents relative to the first seventeen months of the investigation which it had not already turned over to the defense. (Commonwealth's Opposition to Defendant's 1st, 2nd, and 3rd Motions For a New Trial, Exhibit). Trial counsel for Costa filed an affidavit that he never received 7000 pages of information relative to the first seventeen months of this investigation. (Affidavit of Earl C. Cooley, Exhibit 69). The Superior Court denied the petitioner's request to review these documents. (Exhibit 73).

### C. The Fingerprint Cards

Prior to trial, the petitioners requested that the Commonwealth compare the six prints found at the murder scene with the prints of other suspects. (Motion for Exculpatory Evidence). Prior to trial, the Commonwealth maintained that the prints were

8

compared to "the police officers, a variety of people known to the Paglias, then a variety of people known to have criminal records. (Pretrial Motions, March 6, 1987, p.3; April 16, 1987, p. 23; Tr. July 15 138-139, and 146). These "people known to have criminal records" whose prints were compared to the latent have never been disclosed to the petitioners. What is known about these "people with criminal records" is that police had originally focused on "so-called known shooters (and) drug rip-off people." Id. The petitioners were apparently not among this group of suspects because the Commonwealth did not compare either Costa or Daye's prints until March 24, 1987, some 27 months after the murders. (Fingerprint Card Report Costa/Daye (Exhibit 16). The Commonwealth has yet to compare DeNictolis's prints to the latent prints found at the scene. (Comm Opp to 3d MNT, Exhibit 70, 71).

    Prior to trial, the petitioners requested that the Commonwealth compare the six latent prints to one other suspect, Armando Forlizzi. (Motion for Discovery). The Commonwealth, through Trooper Lynch, claimed they could not locate a fingerprint card for Armando Forlizzi.(Lynch Affidavit Exhibit 22). Post trial, the petitioners' requested the Commonwealth compare the fingerprints found at the murder scene with those of Vincent Limoli, Pasquale Barone, and Frank Salemme Jr.; three other suspects named in the Murphy-Pitito report. The Commonwealth did not make the requested comparisons. The petitioners have secured fingerprint cards for both Armando Forlizzi and Vincent Limoli through their request pursuant to the Freedom of Information Act. (Exhibit 39). In conjunction with their most recent Motion For a New Trial, the petitioners requested that the trial court order the Commonwealth to release the original prints to them for comparison with the now located fingerprint cards of Forlizzi and Limoli. (Exhibit 66).

9

The trial court denied this motion because it erroneously concluded that the petitioners had possession of the original prints. (Memo and Decision, Rouse, J., Exhibit 73). The petitioners have never possessed the six original prints found near the body of Patricia Paglia. As such, they could not, as the trial court suggested, test these prints against the known other suspects.

### D. The Misrepresentation in the Macchia Report

After the state court affirmed the petitioner's conviction, the Federal Government moved for trial in the case of United States v. Pasquale Barone docket # 89-289 WF. Barone was charged with, among other things, the murder of Vincent Limoli. During the trial, the government called Elizabeth DiNunzio, Limoli's sister, as a witness against Barone. (Exhibit 35, Tr. October 4, 1983). Defense counsel for Barone cross-examined DiNunzio, questioning her about representations contained in the Macchia report where she allegedly blamed the murder of Limoli and the Paglias on Richard Costa. (Macchia Report, Exhibit 21). DiNunzio denied ever making any statement to Macchia implicating Costa in the murder of the Paglias. (Barone Trial, October 6, 1993, p. 26, Exhibit 35). If DiNunzio's testimony is credible, the Macchia's report contains a material misrepresentation. The state court relied upon that misrepresentation in holding that the Macchia report was not exculpatory because it implicated Costa in the murder of Paglia. Daye at 725. The petitioners were prejudiced by this misrepresentation because this Court never evaluated their claimed Brady violation for the Commonwealth's withholding of the Macchia report based upon its conclusion that the report was not exculpatory. Re-evaluation is now necessary.

STATEMENT OF FACTS

The evidence in this case falls into four categories: (1) Moodie's testimony, (2)the attempted defense of other suspects, (3) ballistics evidence, and (4) alibi evidence.

The Crime and Immediate Investigation

On January 7, 1985, Robert and Patricia Paglia were discovered shot to death in their Lynnfield Home. Robert by his own shotgun, and Patricia through several head wounds by .38 caliber projectiles. (Daye, 411 Mass. at 722. Tr. July 10:55-59).

The Paglias were major cocaine distributors connected to the North End of Boston and North End organized crime figures, including Vincent Limoli and Pasquale Barone. Drugs, drug dealing paraphernalia, and $90, 920.00 in cash were found in the Paglia home. (Daye, 411 Mass. at 722. Interview Reports, Exhibits 7 & 8. Macchia Report [DiNunzio telephone interview], Exhibit 21). State police detective Lieutenant Thomas E. Spartichino, attached to the Office of the Essex County District Attorney CPAC Unit, responded to the Paglia crime scene and headed the ensuing investigation. Officer Vincent Macchia was the chief investigating officer for the Lynnfield Police Department. (Tr. July 7: 114-116; and July 9: 4. Daye, 411 Mass. at 370.)

The only forensic evidence recovered from the Paglia crime scene were six "fairly good" fingerprints removed from the glass top of a pinball machine over the body of Patricia Paglia, and .38 caliber projectiles recovered from near her body. Lt. Spartichino testified that one of the prints, in particular, was "considered a great print, and it was right over the body…having nothing else to go on we used that particular print as the basis of our investigation to determine whether or not we would ever be able to match it." (Tr. July 9 101-103). Ballistically, all that could be determined from the .38 caliber

11

projectiles was that each was fired from the same weapon, which was either a .38 caliber revolver or .357 magnum revolver having a barrel rifled with five lands and grooves with a right twist. (Tr. July 9: 101-103 & 108-114; July 10: 52-59, 113-115; and, July 15: 133-138, & 146. Grand Jury Minutes, pp. 19-20).

On the next Sunday following the Paglia murders, Lt. Spartichino had investigators blockade the street and canvas the entire area: "every door was knocked on and everybody, every citizen in that community in the immediate area was asked if they had seen anything [on the prior Sunday]." The only information received was that a small, cream-colored foreign car had been parked on the wrong side of the street in between the Paglia home and the house next door. (Tr. July 8: 99-100. Grand Jury Minutes, p. 24).

The latent prints recovered from the Paglia crime scene have never been matched to anybody, though compared to the "police officers, a variety of people known to the Paglias, then a variety of people known to have criminal records." The suspects whose prints were compared to the latents have never been disclosed to Daye, but the investigation had focused on so-called "known shooters [and] drug rip-off people." (Pre-Trial Motions March 6, 1987).  Daye was apparently not among this group of suspects, as Costa and Daye's prints were not compared until March 24, 1987, some two years after the murders. The Commonwealth has yet to compare Digitalis' prints with those from the crime scene. (Pretrial Motions, March 6, 1987, p. 3; April 16, 1987, p. 23; Tr. July 15: 138-139 & 146; Fingerprint Comparison Report (Costa-Daye), Exhibit 16).

    (1) <u>Moodie's Testimony</u>

    <u>Karen Moodie and the Ensuing Investigation</u>

Eighteen months following the Paglia murders, on July 5, 1986, Karen Moodie was arrested by Seabrook, New Hampshire police on default warrants and new charges of larceny by check. When Seabrook Detective Jordanhazy declined Moodie's offer of "assistance" to gain release from custody, she claimed to have information concerning a "double homicide in Lynnfield, Massachusetts about a bad drug deal." Detective Jordanhazy contacted Officer Macchia, who immediately responded with Lt. Spartichino to interview Moodie. (Jordanhazy Reports, Exhibit 14; Exculpatory Evidence Disclosure, Exhibit 12; Tr. June 30 93-108 & 113; Daye, 411 Mass. at 725).

Moodie claimed, and has testified, that Costa killed Robert Paglia, that Daye killed Patricia Paglia, and that DiNictolis did not enter the home but drove Costa and Day to and from the Paglia home in his Oldsmobile Cutlass, with a black vinyl top. This is information Moodie claims to have gleaned from conversations, observations, and her own peripheral actions with regards to the planning, execution, and concealment of this crime while sharing a house with Daye in Rye, New Hampshire ("The Rye House"). (Daye, 411 Mass. at 722-725. Tr. June 29: 28-30 & 36-39; Undated: 50-51 & 62-64).

Moodie has a long history of severe drug abuse. At the time of her arrest and interrogation by Lt. Spartichino she was "hurting bad" from heroin withdrawal and was concerned with resolving her legal difficulties and gaining access to some drugs. Because Moodie was arrested on New Hampshire default warrants immediate release could not be arranged, but Lt. Spartichino assured Moodie that she would receive withdrawal medication at the Brentwood lockup. (Exhibit 12). When medication was not provided at Brentwood, however, Moodie called Lt. Spartichino and withdrew her cooperation, stating that it has been given "under duress." Within an hour Moodie was

13

transferred to a Merrimack facility and provided medication. (Exculpatory Evidence Disclosure, Exhibit 12; Tr. June 29 (AM): 58-64, 90-93 & 97-98; June 30(AM): 30-32; June 30(PM): 28-40, 44, 48-52, 70-79, 93-108 & 113; July 1(AM): 58-60 & 74-82; and July 1(PM): 12-16, 23-25, 31, 60 & 65-68.

Moodie had prior criminal convictions for: conspiracy to violate the controlled substance law, knowingly being present where heroin is sold, possession of heroin with intent to sell, breaking and entering in night time, forgery, prostitution, uttering a forged instrument (4 counts), possession of counterfeit identification cards, receiving stolen property 93 counts), and possession of stolen credit cards. (Tr. June 30(PM): 44-52.)

All efforts to independently corroborate Moodie's account failed to connect Daye to the Paglia murders. In fact, several important details of Moodie's story were contradicted by the physical evidence such as:

(a) telephone toll records do not reflect a phone call to the Lynnfield Police Department Moodie claimed she made shortly after the murders. Moodie claims that she was put on hold and then hung up before providing any information. (Exculpatory Evidence Disclosure, Exhibit 10; For full account see Defendant's Memorandum at pp. 10-11, Exhibit 68).

(b) Records and Witnesses memory do not support Moodie's claimed purchase of a box of .38-caliber ammunition allegedly used in the Paglia murders. The Commonwealth's FBI expert on the elemental composition of the bullets recovered at the murder scene testified that they did not all originate from the

14

same box of ammunition. (Russell Merrill, Merrill's Gun Store Interview, Exhibit 11; Tr. Undated: 43-44; July 6: 76-77; and July '4: 34-42 & 154-158; For all full account see Defendant's Memorandum at pp. 11-12).

(c)   Investigators thoroughly searched but could not substantiate Moodie's claim that she and Costa had hidden spent projectiles and casing fired in the Rye House basement in a velvet Crown Royal bag, which was then buried near a rock at the Rye House. Inconsistent with Moodie's claim that Costa took pains to hide these projectiles; investigators recovered numerous spent projectiles and casings strewn about the Rye House basement and yard. (Tr. Undated: 58-59; July 9: 117-123; and July 10: 4-9).[3]

(d)   Moodie claims Daye wore a Boston Police uniform while Costa posed as a DEA agent to gain entry to the Paglia home. She also claims to have gift-wrapped several empty boxes, one containing a .30 caliber carbine, in order to secrete this weapon into the house. Moodie claims Daye and Costa, dressed as these officers, were dropped off in DiNictolis' Oldsmobile Cutlass. Aside from the obvious implausibility of officers working a DEA investigation arriving with Christmas gifts on January 6, particularly where Costa allegedly had access to another handgun, not one element of this elaborate story could

---

[3] For a full account, see Defendant's Brief at pp. 12-13.

be substantiated. The uniform, complete with holster, .38 caliber revolver, and hat, Moodie allegedly hid after the crime could not be found, there is no evidence of the .30 caliber carbine, and a witness reported seeking a small foreign car at the Paglia home on the day of the murders, not the black Cutlass Moodie claimed Daye used. Daye, 411 Mass. at 723-725. Tr. June 29: 28-30 & 36-39; Undated: 50-51 & 62-64; July 7: 124-124; July 8: 19 & 99-100; Grand Jury Minutes p. 24).[4]

(e)   With the assistance of the U.S. Navy, State Police and local police, for five days investigators conducted an extensive search of the Rye Harbor area where Moodie claims to have dumped a bag of evidence, including the above-described police uniform, holster, .38 caliber revolver. No evidence was recovered substantiating Moodie's claim. Daye, 411 Mass. 724.

The defense also called attention to Moodie's extensive criminal record, which notably includes various crimes of deceptive nature, and her long history of drug abuse. She was admittedly suffering from severe heroin withdrawal at the time of her arrest, and her overriding interest was to resolve her own criminal difficulties and gain access to some drugs. See pp. 11-12, supra.

Moodie's trial testimony was replete with inconsistencies and claimed lapses in memory. At one point she made reference to having reviewed some "corrected notes" to

---

[4] For a full account, see Defendant's Memorandum at pp. 13-15.

16

explain her apparent confusion and inconsistent testimony. These notes were supposed to be in the possession of a State Trooper on the prosecution team; however, the prosecution advised the Court that a diligent search had failed to produce them. (Tr. June 29(PM): 65-70; June 30(AM): 6-22, 40-47, 578, 105-106, 109 & 110-12; June 30(PM): 5; July 1 (pm): 34-36, and July 3(AM): 106-108 & 110-118).

Moodie's role in the petitioners' convictions was vital. It is undisputed that absent Moodie's testimony, no evidence existed connecting the petitioners to the crime. Daye at 721. No gun was recovered. No uniforms were found. No money was found. No fingerprints or other trace evidence connected the petitioners' to the crime.

In exchange for her testimony, the Commonwealth disclosed the following promises rewards and inducements to Moodie: (1) that she would not be prosecuted for any involvement in the Paglia murders, (2) that she would not be prosecuted by Massachusetts or the Federal Government, for any other crime she revealed during the course of the investigation, (3) that she would not be prosecuted in New Hampshire for any crime she may have committed there, in reference to the Paglia homicide, (4) she was placed in protective custody, where the Commonwealth paid for her food, clothing, medical expenses, and necessities, (5) the Commonwealth arranged for her admission to a methadone program and assumed all expenses associated with this program. Daye, at 722. See also; Comm. Response to Def's Discovery Motion [Exhibit 12]; Tr, June 19:38, 81-82; June 26(AM):11-15; June 30(PM): 35&82; July 1(AM): 41-49; July 2(PM): 42; July 3(PM): 49; and July 6: 17-22 and 25-26.

The jury never heard any evidence that Moodie believed if she assisted in securing convictions against the petitioners the Commonwealth would pay her

17

$10,000.00. (Exhibit  ). The petitioners were precluded from exploring to what extent, if any, Moodie's testimony was embellished by her motivation to secure the $ 10,000.00 payment for herself and her son.

(2) Other Suspects

From the inception of this prosecution the petitioners have pursued the defense of "other suspects" and inadequate police investigation. Daye at 724-725. The petitioners' entire defense at trial was that other suspects committed this crime. The main weakness in this theory was that the petitioners' could not explain Moodie's intimate knowledge of details of the crime scene. Police reports from the first seventeen months of the investigation hold the key to the connection between Moodie and the crime. While it is true that Moodie associated with Costa, Daye and DeNictolis, Moodie also associated with Limoli, Barone and Salemme, other suspects named in Boston Police files. Had the petitioners been aware of the Boston police reports implicating Limoli, Barone and Salemme, they would have been able to explain Moodie's knowledge of the crime, because Moodie planned the Paglia drug rip-off with Limoli and discussed the Paglia drug rip-off with Barone. (Barone Affidavit, Exhibit 24).

The petitioners defense of "other suspects" was strictly limited at trial on the basis that the petitioners' had not adequately demonstrated that the evidence would tend to show that (1) persons other than them murdered the Paglias, or (2) that the police bungled the investigation or otherwise avoided the pursuit of the truth. Daye, 411 Mass. at 721-722; 727-728. See also, Commonwealth v. Graziano, 368 Mass. 325 (1975) (other suspects defenses); and Commonwealth v. Bowdin, 379 mass. 472 (1980) (inadequate police investigation defense);. See, also, Tr. June 25 132-138, July 8: 139-143, July 9: 76.

18

Seven thousand additional documents have now surfaced. Since the state Court's decision, the petitioners learned through a Freedom of Information request, specifically seeking information from the first seventeen months of the Paglia murder investigation, that the Commonwealth had a file containing over 7000 pages of documents purporting to be from the first seventeen months of the Paglia investigation, before Moodie implicated Daye, Costa and DeNictolis. (Exhibit 39). Trial counsel for Costa submitted an affidavit that he never received 7000 pages of information relative to the first seventeen months of the investigation. (Affidavit of Earle C. Cooley) The Commonwealth submitted no affidavits, but claimed in their opposition to the petitioners' Motion for a New Trial, that the documents, which their office originally claimed related to the first seventeen months of the investigation, were in fact, pleadings of the petitioners. (Commonwealth's Opposition, Exhibit).

The Commonwealth's claim that the petitioners already possessed the documents in dispute is contradicted by specific letters of Essex County Assistant District Attorney Daniel I. Smulow. (Exhibit 39). Assistant District Attorney Smulow confirmed for Daye that the documents were not pleadings, trial transcripts or other documents available in the public file, but were directly related to the first seventeen months of investigation of the Paglia homicides, before the petitioners became suspects. (Exhibit 39). The trial court failed to address this conflict. Instead, the trial court claimed that the petitioners are free to pay the $10,000.00 and review the documents. (Exhibit 73). All thee petitioners are indigent and have no way to pay the Commonwealth for this discovery. Moreover, the trial court's ruling ignores the main thrust of the petitioners' claim; that the trial court ordered the Commonwealth to disclose information regarding other suspects, and they

failed to disclose 7000 pages of documents. The state court evaluated the petitioners claim under the proper Brady analysis.

(3) Ballistic and Elemental Composition Evidence

The ballistic and elemental composition evidence concerns one projectile recovered from the Rye House basement, and four projectiles removed from the body of Patricia Paglia.

All that could be determined by ballistics is that each projectile is a lead .38 caliber bullet fired from either a .38 caliber revolver or .357-magnum revolver having a barrel rifled with five lands and grooves with a right twist. The Commonwealth's expert testified that "thousands…maybe hundreds of thousands" of weapons capable of firing these rounds exist in the United States. (Tr. July 10: 52-59, 109-113,115)

An elemental composition analysis to determine the make-up of these projectiles and search for a match was conducted at the FBI laboratory in Washington, D.C. Special Agent John Riley concluded that only one of the four projectiles removed from Patricia Paglia, and the projectile recovered from the Rye House basement "could" have come from the same source of lead, i.e., from the same pedigree of ammunition produced at an unknown manufacturing site on or about the same date.[5]

The defense called Dr. J. Steven Morris, a scientist since 1973 at the University of Missouri Nuclear Reactor Facility, whose specialty is lead element analysis. Dr. Morris found many deficiencies in the scientific process underpinning Agent Riley's findings and conclusions. Dr. Morris concluded that not one of the four projectiles from Patricia

---

[5] Agent Riley's conclusion, that the four bullets do not all have the same elemental composition, contradicts Moodie's contention that a specific box of .38 caliber "hollow type" ammunition was purchased by her for use in this crime. 9Tr. Undated: 41-451 and July 6: 76-77, See also, p. 13, § (b), supra.

20